# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 10-23641-Civ-MORENO/TORRES

MARLITE, INC.,

      Plaintiff,

v.

ALVIN ECKENROD, and
MODULAR WOOD SYSTEMS, INC.,

      Defendants.


ALVIN ECKENROD,

      Third Party Defendant,

v.

JAMES ROBBINS, individually and as trustee
of a dissolved Florida Corporation, and
JERRY DAGAN, individually and as trustee of
a dissolved Florida Corporation,

      Third Party Defendants.

_____/

## REPORT AND RECOMMENDATION ON PENDING MOTIONS

This matter is before the Court on the following cross-motions for summary judgment: Plaintiff Marlite, Inc.'s ("Marlite") Motion for Partial Summary Judgment [D.E. 67]; Defendant/Third-Party Plaintiff Alvin Eckenrod's ("Eckenrod") Motion for Partial or Final Summary Judgment [D.E. 68]; Defendant Modular Wood Systems, Inc.'s ("Modular") Motion for Summary Judgment [D.E. 69]; and Third-Party

Defendants Jerry Dagen's ("Dagen") and James Robbins' ("Robbins") (together, "Third-Party Defendants") Motion for Summary Judgment [D.E. 101]. Based on a review of the motions and related filings, and the record in the case and in *Marlite, Inc. v. Alvin Eckenrod, et al*, No. 09-22607-CIV-TORRES (S.D. Fla.) ("*Marlite I*"),[1] we recommend for the following reasons that Marlite's motion be Denied; Eckenrod's motion be Granted in part and Denied in part; Modular's motion be Granted; and Third-Party Defendants' motions be Granted.

## I.   BACKGROUND

Marlite and Modular are direct competitors in the slatwall business. Both companies design, engineer, and manufacture wall panel systems. Eckenrod is the president and sole shareholder and officer of Modular. This action concerns sales of slatwall in Florida by Modular and Eckenrod between January 31, 2006 and May 15, 2009.

### A.   *Precision and the Sale to Marlite*

In November 2002, Eckenrod, Dagen, Robbins, and another individual entered into a Shareholders' Agreement ("Agreement") regarding Precision Wood Products, Inc. ("Precision"), a slatwall manufacturing company. [D.E. 1-5]. Eckenrod, Dagen, and Robbins were designated as officers and directors of the company. The Agreement contained a restrictive covenant that precluded Eckenrod and his wholly-owned company, Modular, from competing with Precision, except as to certain specified clients

---

[1]      The Court has taken judicial notice of the proceedings in *Marlite I*. [D.E. 31]. All references to the court docket in this R&R will be to the present litigation unless otherwise noted.

outside the State of Florida, during the term of the Agreement and for two (2) years thereafter.  [*Id.* § 7.1].

On January 31, 2006, Precision sold virtually all of its assets for $3 million to Marlite pursuant to an Asset Purchase Agreement ("APA").  [D.E. 1-3 ].  The APA required, among other things, that Precision deliver to Marlite certified resolutions of its (Precision's) shareholders and Board of Directors authorizing the sale; and that, simultaneously with the closing, Eckenrod and the other selling shareholders execute non-competition agreements with Marlite and execute and deliver Guarantees to Marlite.  [*Id.* §§ 7.09, 7.10, and 7.12; *see* D.E. 43-1 at 143-50; D.E. 43-2 at 68-69].  An integration clause in the APA provided that the APA and certain specified documents constituted the entire agreement and understanding between the parties regarding the subject matter contained therein and superceded all prior agreements and representations, written or oral, by any officer, employee or representative of any party therein.  [D.E. 1-3 § 13.19].

Precision represented and warrantied in the APA that no part of its business was being conducted through "any related parties or . . . affiliate of [Precision] or through any entity that is owned in whole or in part" by Eckenrod or any other shareholder of Precision.  [*Id.* § 3.29].  A complete list of Precision's slatwall customers was described elsewhere in the APA.  [*Id.* § 3.25].

As Precision's President, Dagen executed the APA on behalf of the company.

**B.**   *Restrictive Covenants in the APA and Non-Compete*

The APA contained a five-year non-competition provision that prohibited Precision and "all of its affiliates and/or related parties" from engaging "in any business in competition with [Marlite] as it is conducted immediately prior to the Closing" in Georgia and Florida.  [*Id.* § 5.01(a)].

The Non-Competition Agreement that Eckenrod executed on January 31, 2006 ("Non-Compete") provided that he would not compete with Marlite within the State of Florida for a period of three years after the closing date of the APA.  [D.E. 1-4 § 1]. "Notwithstanding" the afore-mentioned restriction, Eckenrod was expressly permitted to "continue to own, operate and conduct in competition with [Marlite] and as conducted as of the Closing Date of the [APA], the following businesses owned by [Eckenrod]: Modular Wood Systems, Inc. and Interlam, Inc." [*Id.*].  The Non-Compete expressly stated that Marlite would not effectuate the APA unless Eckenrod agreed to the terms and conditions of the Non-Compete and, moreover, that Eckenrod acknowledged that the restrictive covenant was reasonable and that serious injury and loss would ensue to Marlite if Eckenrod competed with Marlite after the sale had occurred.  [*Id.*].

The Non-Compete also contained restrictive covenants prohibiting Eckenrod from the unauthorized use of Marlite's confidential information and from employing or contracting with certain individuals and entities for a three-year period after the Closing Date of the APA.  [*Id.* §§ 2, 3].

### C.   *Modular*

After January 31, 2006, Eckenrod continued to operate Modular as its President and sole shareholder and officer.

### D.   *Marlite I*

Marlite filed suit on October 9, 2009 against Modular and Eckenrod for misappropriation of trade secrets, tortious interference, and breach of contract.  The claims stemmed from Defendants' improper hiring of a former Marlite employee and from the solicitation of Marlite's customers by the employee on Modular's behalf.  The Honorable Donald L. Graham, then the presiding judge in the case, granted partial summary judgment for Marlite on its claim that Eckenrod breached his Non-Compete by hiring the former Marlite employee.  [D.E.145 in *Marlite I* at 12-13].

A jury trial was held on the remaining claims and, in accordance with the jury's verdict, final judgment was entered in favor of Marlite on some though not all of its claims.  [D.E. 248 in *Marlite I*].  The Court of Appeals affirmed the judgment.  *See Marlite, Inc. v. Canas*, 453 Fed. Appx. 938 (11th Cir.  2012) (unpublished*)*.

Of particular relevance in the present case are the jury's findings that (1) Modular was an "affiliate or related party" of Precision pursuant to Section 5.01(a) of the APA and (2) Modular was subject to the three-year non-competition period specified in Eckenrod's Non-Compete rather than the five-year period set forth in the APA.  [D.E. 200 in *Marlite I* at 1-2 ¶¶ 1, 2].[2]

---

[2]    The relevant portions of the jury instruction on Marlite's claim for breach of the Non-Compete by Modular are quoted below:

Marlite has asserted that Modular was contractually precluded from

competing with the Florida business Marlite purchased, Precision [], by a five-year period commencing January 31, 2006.  Marlite relies on the language of Section V of the Asset Purchase Agreement . . . which contains the following restriction against competition: [text of Section 5.01(a) intentionally omitted]

\* \* \*

In order for Marlite to prevail on this claim, Marlite must first show by the greater weight of the evidence that Modular was an "affiliate and/or related party" of Precision."

\* \* \*

If, however, you determine that Modular and Precision were affiliated, such that Article V of the Agreement bound Modular to refrain from competing with Marlite in its Florida business for five years from the date of the Agreement, you should then consider the fact that this broader non-competition agreement may conflict with the specific provisions of the [Non-Compete].  Under the terms of the Eckenrod Non-compete, Mr. Eckenrod personally was prohibited from competing with Marlite for a three-year period in connection with [] Marlite's Florida business purchased from Precision.  The Eckenrod Non-compete contained an exception to this restriction, which provided that he could "continue to own, operate and conduct" his other businesses, including Modular, in competition with Marlite as he had done as of the Closing of the Agreement.

Contracts are to be construed according to the plain meaning of the words contained in them.  Where there are conflicting terms, contract principles give the specific term more weight than the general term.  Where there are conflicting terms, you should determine the intent of the parties by examining their conduct, their language, and the circumstances that existed at the time they allegedly entered into the contract.

If you determine that the parties' intent for these agreements was for Mr. Eckenrod to refrain from competing with Marlite's Florida businesses only for a three year period, then your verdict should be for Defendants on the breach of contract claim.  If you find by the greater weight of the evidence that Marlite has shown that the parties intended that Modular be subject to a five year non-competition period, in addition to the three-year non-competition period that applied to Mr. Eckenrod personally,

### E.   *Marlite II*

During discovery in *Marlite I*, Eckenrod initially indicated in sworn discovery responses that he had honored the restrictive covenants contained in the APA and in the Non-Compete.  However, he later admitted in deposition that his sworn responses were inaccurate and he confirmed that Modular had in fact been selling slatwall in Florida continuously and in direct competition with Marlite from January 31, 2006 to the then-present (March 16, 2010).  [D.E. 118-4 in *Marlite I* at 4-5; *see also* D.E. 40-2 at 113-14, 188].

Based on these admissions, Marlite sought leave to amend its complaint to assert additional claims against Defendants based on the newly-discovered evidence of violations of the APA and Non-Compete, but that request was denied.  On October 8, 2010, Marlite filed the present lawsuit against Eckenrod and Modular raising these claims.  [D.E. 1].

Marlite now seeks damages resulting from the sales that Defendants made to Marlite's Florida customers in violation of the APA and the Non-Compete.  Counts 1-4 and 6-7 of the Complaint state claims against Eckenrod individually for:  breach of the APA (Count 1); interference with contract (Count 2); fraudulent inducement (Count 3); negligent misrepresentation (Count 4); breach of the Non-Compete (Count 6); injunctive relief (Count 7).   Count 5 states the sole claim against Modular, for injunctive relief (Count 5).

———————————

then your verdict should be for Marlite on this claim.

[D.E. 197 in *Marlite I* at 7-9].

Eckenrod answered the Complaint, asserted various affirmative defenses, and filed a Third-Party Complaint against Dagen and Robbins, individually and as trustees for a dissolved Florida corporation, for implied indemnity (Count 1) and common law indemnity in the alternative (Count 2). [D.E. 32 at 15-20 ("Third Party Complaint")]. Eckenrod seeks indemnification from Dagen and Robbins in the event he is found liable to Marlite for losses suffered as a result of misrepresentations made during the negotiation of the APA or a breach of the duty to disclose the fact of Modular's competition with Precision and Marlite.

## II.   ANALYSIS

### A.   *Summary Judgment Standard*

All of the parties in this case have moved for summary judgment.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the Court must view all the evidence and make all reasonable inferences in the light most favorable to the non-moving party.  *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)).  A material fact is one that might affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted.  *See Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, our task is to determine whether, considering the evidence in the light most favorable to the non-moving party, there is evidence on which the trier of fact could reasonably find a verdict in that party's favor. *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225. If so, summary judgment is not appropriate.

When, as here, opposing parties have submitted cross-motions for summary judgment, we need not grant summary judgment as a matter of law for either side. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (noting that cross-motions for summary judgment need not result in the granting of summary judgment). Rather, we must evaluate each motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. *Id.*; *see also Colony Ins. Co. v. Mederos Crystal Lake Condo, LCC*, No. 09-CV-23073, 2010 WL 4137503, at *2 (*S.D. Fla. Oct. 19, 2010) ("In other words, rejecting one cross-motion does not mean that the other must be granted.").

### B.     *Marlite's and Defendants' Cross-Motions for Summary Judgment*

Marlite moves for partial summary judgment, on issues of liability only, on its claim that Eckenrod breached the APA (Count 1) and the Non-Compete (Count 6); tortious interference with contract by Eckenrod (Count 2); and injunctive relief against Modular (Count 5) and Eckenrod (Count 7). Eckenrod and Modular move for summary judgment in their favor on each of the counts against them. We will start with the more complex issues raised for Count 6.

### 1. *Breach of Eckenrod's Non-Compete*

Marlite argues for summary judgment on its claim that Eckenrod breached his Non-Compete by competing with Marlite in the Florida slatwall market after January 31, 2006, through the present day (Count 6).[3]  Marlite claims the Non-Compete clearly and unambiguously prohibited Eckenrod, directly or indirectly through Modular, from selling slatwall in competition with Marlite within the State of Florida for three years after the closing date of the APA.  Marlite acknowledges that Section 1 of the Non-Compete sets out an exception to the foregoing restriction on competition, but argues the exception only permitted Eckenrod – acting through Modular – "to continue to compete with Marlite in territories outside of the Florida market as [Modular] had done prior to the Closing Date of the APA."  [D.E. 67 at 18].  Marlite asserts it is undisputed that Modular was not competing with Precision or Marlite in Florida on January 31, 2006, yet Modular sold slatwall in the state within three years after that date, thus Eckenrod violated his valid and enforceable restrictive covenant and summary judgment on this claim is appropriate.

Eckenrod and Modular agree with Marlite that the Non-Compete is clear and

---

[3]  Specifically, Marlite alleges that Eckenrod breached Sections 1, 2, and 3 of the Non-Compete by:

> (i) competing directly or indirectly with Marlite by selling slatwall in Florida from the date he entered into the [Non-Compete] to the present, (ii) contracting with or otherwise selling slatwall to sales representatives and/or distributors of Marlite from the date he entered into the [Non-Compete] to the present, and (iii) using Confidential Information for his benefit and the benefit of Modular from the date he entered into the [Non-Compete] to the present.

[D.E. 1 at 15 ¶ 91].

unambiguous, but the agreement ends there.  Defendants argue it is undisputed that the parties intended for Eckenrod, through Modular, to be exempt from the restrictions on competition listed in Section 1, allowing Modular to continue to compete with Marlite in Florida as it had been doing up to that point.  Moreover, based on other language in Section 1,[4] Defendants assert the exemption applied contract-wide, taking precedence over the anti-disclosure and anti-hiring provisions specified in Sections 2 and 3 of the Non-Compete.  They claim that this "global exemption" permitted Modular to "continue in competition and operate in competition anyway it wanted, and Eckenrod is immune from any claim of breach of contract or imaginary tort."  [D.E. 68-2 at 25; *see also* D.E. 69 at 5 ("When the [exemption] clause is given its plain meaning, it is clear that Modular has the absolute right to compete with Marlite anytime anywhere.")].

We conclude that Defendants' "global exemption" argument fails as a matter of law.  Defendants are foreclosed from raising this defense because the issue was previously decided against them in *Marlite I.*  Moreover, on the merits, a fair reading of the Non-Compete does not support their "global exemption" argument.

---

[4]     This paragraph reads in its entirety:

These covenants by [Eckenrod] shall be construed as an agreement independent of any other provision of this [Non-Compete] or any other agreements between the parties.  The existence of any claim or cause of action by [Eckenrod] against [Marlite], whether predicated on this [Non-Compete] or otherwise, or under the [APA], shall not constitute a defense to the enforcement by [Marlite] of these restrictive covenants against competition.

[D.E. 1-4 at 3-4].

(a)   <u>*Collateral Estoppel*</u>

Collateral estoppel, or issue preclusion, "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) (citing *Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328-29 (1971)).  The Eleventh Circuit has articulated the following standard for collateral estoppel to apply:

> To claim the benefit of collateral estoppel the party relying on the doctrine must show that: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000) (citing *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998)).[5]

Eckenrod's argument that the Non-Compete contains a "global exemption" exempting him from the various restrictive provisions of the Non-Compete has already been litigated, and rejected.

In *Marlite I*, Judge Graham determined as a matter of law that Eckenrod breached Section 3 of the Non-Compete by hiring a Marlite employee to work at

---

[5]   When a federal court sitting in diversity examines the collateral estoppel or res judicata effect of a prior federal judgment, based either on diversity or a federal question, it must apply federal common law.  *CSX Transp., Inc. v. Brotherhood of Maint. of Way Employees*, 327 F.3d 1309, 1316 (11th Cir. 2003) (federal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question jurisdiction).

Modular without waiting the three-year period specified therein. Judge Graham could not have reached this result had the Non-Compete allowed Eckenrod and Modular to compete freely with Marlite, including through hiring, as they now allege in this case.

Similarly, rejection of the "global exemption" defense is inherent in the jury's finding that Modular was an affiliate or related entity of Precision and therefore subject to the non-competition provisions in the APA and Non-Compete for three years (rather than five). Thus, the ultimate issue of whether the Non-Compete contained a "global exemption" that gave Eckenrod and Modular complete freedom to compete with Marlite in Florida was, implicitly if not explicitly, rejected in the trial proceedings. *See, e.g., RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291-94 (5th Cir. 1995) (the court looked at the actual arguments made by the parties during trial, the jury instructions, and the jury's special verdict in order to define the issue that was actually litigated in the prior proceeding, then held that where "the factual issue that forms the basis for [a party's] theory [] has been actually litigated in a prior proceeding," the issue may not be relitigated); *Tremont LLC v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 825-835 (S.D. Tex. 2010) (concluding that an arbitration panel's construction of a contract to determine the responsibility for remediating environmental contamination was binding in a subsequent litigation turning on the same contract-interpretation issue even though the sites at issue in the two proceedings were different).

Even more significant, though, is the fact that Defendants *directly* raised this issue in their appeal in *Marlite I* where they sought reversal of Judge Graham's ruling against Eckenrod on the breach of contract claim, the judgment entered on the jury's verdict, and the Court's Order on post-trial motions. Eckenrod specifically argued to

the Eleventh Circuit Court of Appeals that the Non-Compete granted him "explicit independent permission to compete through Modular" as "[t]he parties expressly intended to globally exempt [him] from a non-compete agreement so long as he acted through . . . Modular[]." *See* Brief in Chief for Appellant Alvin Eckenrod in No. 11-10593 at 16, 26, *Marlite, Inc. v. America Canas*, 453 Fed. Appx. 938 (11th Cir. 2012) (Nos. 11-10592, 11-10593). Modular likewise argued that the "fully integrated APA and [Non-Compete] clearly granted Modular a blanket exemption to compete with Marlite [so that] Modular was specifically exempted from any anti-competition agreements[.]" *See* Brief for Appellant Modular Wood Systems, Inc. in No. 11-10592 at 10, *id.*

The Eleventh Circuit necessarily rejected the "global exemption" argument in affirming the rulings and judgment below. 453 Fed. Appx. at 939 ("After reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we conclude that there is no merit to any of the arguments presented by Modular or Eckenrod on appeal."). If the court had construed the Non-Compete to contain a "global exemption," it would have *had* to reverse the judgment against Defendants. Rejection of the "global exemption" was thus critical to the appellate court's affirmance of the judgment below.

All the requirements necessary for application of collateral estoppel have been met here. The argument that Defendants make in this proceeding is identical to the one raised in the prior proceeding. Defendants had the opportunity to fully litigate their "global exemption" defense in *Marlite I*, and resolution of that issue against them was critical and necessary for a final determination in the proceeding. Defendants are,

therefore, barred from raising the issue again in this case.

(b)     *Construction of the Non-Compete Agreement*

Even if collateral estoppel did not apply, a fair reading of Eckenrod's Non-Compete does not support Defendants' argument that the Non-Compete established a "global exemption" allowing Eckenrod to conduct Modular without restriction.

Contract interpretation is a matter of law to be determined by the Court.  *See, e.g., Hartsford Ins. Co. v. Bellsouth Telecomms., Inc.*, 206 Fed. Appx. 952, 954 (11th Cir. 2006).  When the terms of a contract are clear and unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls.  *See, e.g., ClearPlay, Inc. v. Nissim Corp.*, No. 07-81170-CIV, 2011 WL 6724156, at *3 (S.D. Fla. Dec. 21, 2011); *Green v. Life & Health of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) (contract language that is unambiguous on its face must be given its plain meaning). A court may not consider extrinsic evidence where the contract is clear and unambiguous.  *ClearPlay,* 2011 WL 6724156, at *3.  "Thus, a party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract."  *Id.* (internal quotations omitted).

On the other hand, when the wording of a contract is ambiguous, "its interpretation involves questions of fact, precluding summary disposition."  *Smith v. Shelton*, 940 So. 2d 450, 451 (Fla. 4th DCA 2007).  Whether a contract is ambiguous depends on whether it is reasonably susceptible to more than one interpretation.  *Id.*; *see also Ostrow v. GlobeCast America Inc.*, No. 10-61348-CIV, 2011 WL 4853568, at *16 (S.D. Fla. Oct. 13, 2011) (where two reasonable interpretations of a contract exist,

summary judgment is inappropriate because a genuine issue of material fact exists). However, an ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner.  *Shelton*, 940 So. 2d at 451.

When construing a contract, a court should read the contract as a whole, giving effect to each of the various provisions of the agreement if it can reasonably be done. *See, e.g., MDS (Canada), Inc. v. Rad Source Technologies, Inc.*, 822 F. Supp. 2d 1263, 1296 (S.D. Fla. 2011); *Jones v. Warmack*, 967 So. 2d 400, 402 (Fla. 1st DCA 2007).  The court "should strive to give effect to the intent of the parties in accord with reason and probability as gleaned from the whole agreement and its purpose." *Arthur Rutenberg Corp. v. Pasin*, 506 So. 2d 33, 34 (Fla. 4th DCA 1987).  "[I]f one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability." *American Med. Int'l, Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. 4th DCA 1984) (defendant's interpretation of his employment contract rendered certain clauses "irreconcilable and totally destroy[ed] the unambiguous language (in the actual contract) in both clauses.  The general scope and intent of the contract was obviously not to confer a lifetime benefit on [him].").

Applying these principles of contract construction, we find Eckenrod's Non-Compete is clear and unambiguous.  We therefore do not resort to extrinsic evidence to discern the parties' intent regarding the scope of permissible competitive activities by Defendants following Precision's sale to Marlite.

In Section 1 of the Non-Compete, entitled "Restrictive Covenant," Eckenrod agreed to refrain, for a three-year period following execution of the APA, from directly or indirectly competing with Marlite by selling slatwall in Florida.  The exception in

this section allowed Eckenrod to continue operating Modular in competition with Marlite as Modular's business was conducted on the date of execution of the APA. Marlite accepted that condition, relying as it reasonably should have on the representations in the APA that the bulk Eckenrod's business in Florida operated through Precision, *not* Modular.

But the parties disagree about the business that Modular was conducting in Florida as of January 31, 2006, and therein lies the rub. Each side asserts the Non-Compete is unambiguous, then resorts to extrinsic evidence to reach its desired interpretation of the Non-Compete.

Eckenrod claims that Marlite knew that Modular was selling slatwall in Florida prior to January 31, 2006, and the Non-Compete permitted continued unfettered competition with Marlite in Florida. Marlite, on the other hand, asserts that Modular was *not* competing in the slatwall market in Florida before January 31, 2006, other than sales to Home Depot, thus the Non-Compete prohibited Modular from competing within the State of Florida for three years.

It is clear from the record that the extent of Modular's business in Florida (separate and apart from Precision) as of January 31, 2006 is in dispute. Both sides have attempted to treat what is really a disputed issue of material fact as a matter of established fact. No ambiguity of the operative contract document is created but, rather, the factual issue of a breach of that document is one that must be resolved by the fact-finder after evaluating the credibility of the witnesses and considering the other evidence admitted on the issue. From the evidence gathered in Marlite I and Eckenrod's admissions in discovery during that case, one could argue that no

reasonable juror could find in Eckenrod's favor.  That is clearly the most reasonable construction of all the evidence. But on summary judgment reasonable inferences are to be drawn in the non-movant's favor.  Faced with that inference, the Court cannot find that, as a matter of law, the scope and extent of Modular operations in Florida prior to the APA is fixed in concrete.  There is room for a genuine factual issue on this point, rendering partial summary judgment in Marlite's favor inappropriate.

Regardless of how the jury will resolve that question, we reject Defendants' contention that the Non-Compete can be construed to establish a "global exemption" allowing Eckenrod to operate Modular without any restriction whatsoever on competition.  They posit that the "independent agreement" language in Section 1 causes the "global exemption" of Section 1 to apply as well to Sections 2 and 3, thereby exempting him, operating through Modular, from the disclosure and hiring restrictions contained in those other sections.  However, there is no language in the Non-Compete suggesting the parties intended that result, and such a construction would render the restrictions in Sections 2 and 3 superfluous.

Moreover, Defendants take the "independent agreement" language out of context.  Reading the paragraph in its entirety, and in the context of Section 1 as a whole, it is clear that the provision concerns Marlite's future ability to enforce the competitive restrictions of Section 1 against Eckenrod.  The parties intended to preserve this right to Marlite notwithstanding any other agreement between the parties and a future claim by Eckenrod against Marlite.

In addition, Defendants' construction ignores Eckenrod's express acknowledgment in Section 1 that the restrictive covenant was reasonable and that

Marlite was agreeing to the terms "because of the unique and essential nature" of Eckenrod's services to Precision prior to the APA, and "the serious injury and loss" that would ensue were Eckenrod "able to use the ability and knowledge [he] gained while employed by" Precision to benefit a competitor or himself by competing with Marlite after consummation of the APA.  [D.E. 1-4 at 3].

Indeed, the interpretation proposed by Defendants would lead to an absurd result:  Marlite agreed to pay $3 million under the APA to acquire the customer lists and other assets of a Florida slatwall business in order to expand its slatwall business into a territory in which it had a limited presence (Florida), while simultaneously agreeing that the former co-owner of the business who was familiar with its customers and trade secrets and who ran his own slatwall company could freely compete with Marlite's newly-acquired business in the new market without any limitation on competition whatsoever.  We have no difficulty finding that the general scope and intent of the Non-Compete was not to pay Eckenrod for Precision's sale to Marlite *and* give him the right to unfettered competition with Marlite immediately after the sale.[6]

To prevail on a breach of contract claim, Marlite must prove (1) the existence of a contract; (2) a breach thereof; and (3) damages that flow from the breach.  *See Knowles v. C. I. T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977).  We find, on this record, that questions of fact exist regarding the business that Modular was conducting in competition with Precision/Marlite in Florida as of January 31, 2006, whether

---

[6]   Defendants raise the "global exemption" theory throughout their summary judgment briefs.  As we have sufficiently explained why the argument is barred and why it lacks merit, we need not address it again.

Marlite was aware of that business before entering into the APA, whether Modular engaged in any additional business in Florida after January 31, 2006, and whether and to what extent Marlite was damaged as a result of Defendants' actions, if at all.

Such questions preclude the entry of summary judgment on this claim for breach of Eckenrod's Non-Compete.   We therefore recommend that both Marlite's and Eckenrod's requests for summary judgment on Count 6 be Denied based on collateral estoppel and on the merits of the breach of contract claim at issue that require further factual development notwithstanding the unambiguous contractual provisions that govern the case.   The Court can find, however, that Eckenrod's persistent "global exemption" defense is unavailing as a matter of law and should be further precluded from the case.

## 2.  *Eckenrod's Breach of the APA*

Marlite argues it is entitled to judgment as a matter of law on its claim that Eckenrod breached the APA (Count 1).   We disagree, and recommend instead that Eckenrod's motion for summary judgment on this count be granted.

Eckenrod did not sign the APA.   Nonetheless, Marlite argues he is liable for a breach of the agreement because (1) he expressly consented to and approved certain representations and warranties regarding Precision's Florida customers and its slatwall business that were set out in the APA when he expressly authorized Precision to enter into any agreements necessary to effectuate the sale of Precision's assets to Marlite (through his execution of two documents, the Consent of Shareholders and the Joint Resolution of the Board); and (2) he expressly agreed to be financially liable for any and all obligations of Precision under the APA (through his execution of the

Guaranties of Obligations of Seller). These particular instruments were made part of the closing documents of the APA and were conditions precedent to the sale of Precision, without which Marlite would not have consummated the purchase.

None of those compelling facts overcomes the well-established principle in Florida that a breach of contract claim may only be maintained against a party to the contract. "Generally, a contract does not bind one who is not a party to the contract, or who has not agreed to accept its terms." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1074-75 (11th Cir. 2003) (explaining that a parent corporation does not bind a subsidiary merely because one corporation owns all the stock of the other corporation); *see also Preve v. Albert*, 578 So. 2d 33, 34 (Fla. 4th DCA 1991) (reversing judgment against wife for breach of a real estate contract even though she had submitted and signed the first offer to purchase the property, where that offer was rejected and she was not a signatory on the contract that ultimately was accepted by seller); *In re Donner's Estate*, 364 So. 2d 742, 749 (Fla. 3d DCA 1978) (willful breach of a contract by one party cannot be "passed on" to another who knew of the contract and benefitted from its breach, where she was not a party to the contract and had no contractual relationship with the one suing for breach). Notably, Marlite has not cited nor have we located any cases that support its argument that Eckenrod as a non-signatory to the APA is liable for its breach. It is perhaps telling that Marlite has asserted tortious interference with the APA as an alternative theory of liability. As we discuss below, that may be a worthy claim against Eckenrod. But a direct breach of contract claim against him personally on the APA is unavailing as a matter of law.

We therefore recommend that summary judgment be entered for Eckenrod and against Marlite on Count 1.

### 3.   Tort Claims

Both Marlite and Eckenrod move for summary judgment on Marlite's claim of tortious interference with contract by Eckenrod (Count 2).   Eckenrod moves for summary judgment on the other two tort claims, fraudulent inducement (Count 3) and negligent misrepresentation (Count 4).

(a)   *Tortious Interference with Contract*

Marlite acknowledges that its claim for tortious interference with contract arises only if Eckenrod is found to not be a party to the APA.  If that is the case, Marlite seeks to hold him liable for tortiously interfering with the contractual relationship between Marlite and Precision through Modular's sales of slatwall in Florida, which Marlite asserts violated the restrictive covenant in the APA that was applicable to Modular as an affiliate of Precision under that contract.

To prevail on a claim for tortious interference with a contractual relationship, a party must show:  (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege for the breach; and (5) resultant damages.  *See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir 1998) (citing *Florida Tel. Corp. v. Essig*, 468 So. 2d 543, 544 (Fla. 5th DCA 1985)).

Marlite has alleged that Eckenrod knew about the restrictions against competition set forth in Article V of the APA as he consented to and authorized Precision to enter into that agreement.   According to Marlite, those restrictions

prohibited Modular, as an affiliate of Precision, from engaging in any business in competition with Marlite's newly-acquired business as it was conducted immediately prior to January 31, 2006 in Florida. Notwithstanding those restrictions, Eckenrod (through Modular) sold slatwall in Florida in competition with Marlite from January 31, 2006 through the present, causing Modular to breach the APA and interfering with the relationship between Marlite and Precision.

This claim relates to a breach of the APA and, consequently, must be considered with due regard for the jury verdict in *Marlite I*. The jury found that Modular was an affiliate or related entity of Precision and thereby bound by the restrictions on competition set forth in the APA. However, when faced with conflicting non-competition provisions in the APA and the Non-Compete, the jury determined that the parties had intended that Modular would be subject to the more specific provisions of the Non-Compete rather than the broader provisions found in the APA. Thus, the jury found that Modular was prohibited from competing with Marlite for three years, as set forth in the Non-Compete, rather than for five years, as contemplated by the APA.

We are bound by the jury's determination that Modular is subject to the non-competition provisions in the Non-Compete. For this reason, the claim that Eckenrod caused Modular to breach the APA actually requires determining whether Modular breached the Non-Compete.

Although we find that Marlite has presented evidence that Modular violated Section 5.01(a) of the APA,[7] the same cannot be said for whether Modular violated the

---

[7]   With regard to the evidence supporting Marlite's claim, there is no dispute that Eckenrod was aware of the APA and the restrictions on competition set forth in Article

Non-Compete. As discussed above in Section II.B.1.b. *supra*, there are questions of fact regarding whether Modular's sales in Florida breached the Non-Compete. Thus, because as discussed below none of the legal bases asserted by Eckenrod to defeat this claim has any merit, the tortious interference claim must be submitted to the jury. Again, the evidence supporting Marlite's tortious interference claim is compelling. How Eckenrod will be able to explain to the jury why he believed he could surreptitiously engage in significant slatwall sales within the State of Florida during the relevant period will be a sight to see. So much so that a punitive damage instruction may well be necessary. But on summary judgment, the Court cannot dispose of this

---

V therein. He insists that he was not involved in negotiating the terms of the APA, did not know that his Non-Compete would be incorporated into the APA, never looked at the schedule attached to the APA that identified the customers that Marlite was acquiring from Precision, did not receive a copy of the executed APA until March 2006, and never looked at the document until early 2009. [D.E. 75-1 at 2, 4–5 ¶¶ 4, 10, 13, 14]. But Eckenrod executed corporate documents expressly authorizing Precision to enter into an agreement to sell its assets to Marlite. He acknowledged at trial in *Marlite I* that he was familiar with the restrictive covenant in Section 5.01, including the penalties that could be imposed if the non-competition provisions of Section 5.01(a) were violated. [D.E. 40-2 at 129]. He even conceded that a violation would occur if any affiliate of Precision violated those provisions. [*Id.*]. He has never claimed he was unaware that the APA restricted Precision and its affiliates from competing with Marlite in the business that Marlite was purchasing, i.e., Precision's Florida slatwall business, for a specified period of time. Indeed, restrictions on competition were of the highest priority to him at that time, given his extended negotiations with Marlite over the terms of his own Non-Compete in connection with the sale of Precision's assets.

Eckenrod freely admits that Modular, an affiliate or related entity of Precision, competed with Marlite in Florida after the closing date of the APA. But he argues Modular was exempt from the APA's restrictive covenant based on the exemption in his Non-Compete and its incorporation into the APA. The essence of Eckenrod's defense is that he was permitted to operate Modular in Florida without restriction, notwithstanding any other agreement to the contrary. Eckenrod's reliance on this "global exemption" is unavailing for the reasons previously articulated. *See* Section II.B.1. *supra*.

intentional tort claim that requires a factual and demanding examination of Eckenrod's intent, his puported good faith, and the extent of any true injury to Marlite that resulted from his and his company's conduct.

For his part and in support of his motion on this claim, Eckenrod makes several legal arguments that prove to be wholly lacking in merit. He argues that the tortious interference claim cannot be sustained because, given his enforceable right to compete under the APA (by virtue of the Non-Compete's incorporation into the APA), he was not a "stranger" to the APA. He relies on the legal principle that only a third party, or stranger to a contract, can tortiously interfere with a contractual relationship. *See, e.g., Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001) ("Under Florida law, a claim for tortious interference with contract cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party. In other words, 'the interfering defendant must be a third party, a stranger to the business relationship.'" (internal citations omitted)).

Eckenrod's argument is not well taken. Eckenrod cannot avoid liability for breaching the APA by maintaining that he was not a party to the APA and disavowing any responsibility for negotiating the agreement, while simultaneously insisting that he has sufficient enforceable rights in the APA and is no stranger to the contract so as to defeat a claim for tortious interference.

Eckenrod also asserts that the economic loss rule bars this claim. The economic loss doctrine is a judicially-created doctrine that precludes recovery in tort where the only damages suffered are economic losses. *See, e.g., Indem. Ins. Co. of N. America v. American Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004). If the misrepresentations or

omissions of a defendant relate to the defendant's failure to perform the contract, then the economic loss doctrine bars the plaintiff from maintaining an independent tort claim against the defendant. *See, e.g., Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 76-77 (Fla. 3d DCA 1997). If, on the other hand, they relate to promises made to induce the other party to enter into the contract, the tort claim is not barred. *Id.* As the court in *Allen v. The Stephan Co.*, 784 So. 2d 456 (Fla. 4th DCA 2000), explained:

> The law is well established that the economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation. If the fraud occurs in connection with misrepresentations, statements or omissions which cause the complaining party to enter into a transaction, then such fraud is fraud in the inducement and survives as an independent tort. However, where the fraud complained of relates to the performance of the contract, the economic loss doctrine will limit the parties to their contractual remedies.

*Id.* at 457 (citations omitted).

In this case, the tortious interference claim is unrelated to Eckenrod's performance under the APA, a contract he successfully argued he was not a party to. Rather, the claim relates to Eckenrod's conduct in operating Modular in competition with Marlite in Florida after January 31, 2006, despite a prohibition on such competition. The economic loss doctrine has no applicability here.

Nor does the parol evidence rule apply, which Eckenrod also raises as a basis to defeat the tortious interference claim. The rule applies when parties intend that their written contract be their final and complete agreement, thus precluding the admission of evidence of prior or contemporaneous oral agreements to vary or contradict the unambiguous language of the contract. *See, e.g., Johnson Enters.*, 162 F.3d at 1309.

Eckenrod posits that the rule governs here because the APA is a clear and unambiguous contract such that parol evidence may not be used to vary the parties' meaning, and because the integration clause of the APA, Section 13.19, precludes Marlite's reliance on any representations that were not incorporated into the agreement. But Marlite is not seeking to vary or contradict the terms of the APA in this count, thus the parol evidence rule is inapplicable.

For all the foregoing reasons, we recommend that the parties' motions for summary judgment on Count 2 be Denied.

(b)     *Fraudulent Inducement and Negligent Misrepresentation*

Marlite's claims for fraudulent inducement (Count 3) and negligent misrepresentation (Count 4) are premised on Eckenrod's alleged oral and written misrepresentations to Marlite that neither he nor Modular were doing business in Florida in competition with Precision prior to January 31, 2006; Marlite's reasonable reliance on those representations which led to decision to purchase Precision and enter into the APA; and resultant damages to Marlite.

To prove a claim for fraud in the inducement, a plaintiff must show: (1) a misrepresentation of a material fact, (2) known by the defendant to be false, (3) made to induce the plaintiff to rely on it, and (4) the plaintiff suffered injury in justifiable reliance on the representation. *See, e.g., Output, Inc. v. Danka Bus. Sys., Inc.*, 991 So. 2d 941, 944 (Fla. 4th DCA 2008). The same elements must be proven to prevail on a negligent misrepresentation claim except that knowledge need not be established. *See, e.g., Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1411 (M.D. Fla. 1998).

We find that Marlite has presented sufficient evidence on these claims to withstand the motion for summary judgment.  It is undisputed that Marlite knew Modular was selling slatwall to Home Depot in Florida prior to the closing date of the APA.  Popa testified, though, that Home Depot was the only Florida customer he knew Modular was selling to.  Popa stated that Eckenrod affirmatively told him that neither he nor Modular was selling slatwall to any other customer in Florida and that neither was otherwise competing with Precision in the Florida market at the time of closing.  Popa explained that had he known the statements were false, Marlite would not have purchased Precision.  [*See, e.g.,* D.E. 71 at 43-47, 54-57, 69, 72-73].   Representations and guarantees in Article III of the APA provided further assurances to Marlite that no part of Precision's business was being conducted by Eckenrod or Modular.  [*See, e.g., id.* at 48-49].

However, Eckenrod denied making any statements to Popa concerning Modular's slatwall sales in Florida.  [*See, e.g.,* D.E. 40-5 at 167-68; D.E. 75 -1 at 2, 3, 4 ¶¶ 5, 8, 11].  Morever, he denied seeing the list referenced in Section 3.25 prior to the closing [*see, e.g., id.* at 2 ¶ 4] even though he executed various documents approving the sale of Precision to Marlite and his attorneys were provided drafts of the APA to review with him prior to the closing date.  There is thus abundant direct and circumstantial evidence that Eckenrod knowingly made representations, intending for Marlite to rely on them, and knowing that he intended from the inception of the relationship to violate them to reap greater profits than the parties' contractual relationship intended or permitted.  That is a textbook fraudulent inducement claim.  And the material facts are in dispute, and it will be up to the jury to determine whether Eckenrod knowingly

made certain representations of fact that were inaccurate and were intended to induce Marlite to enter into the APA.

We reject the legal arguments Eckenrod makes in support of judgment in his favor on these two tort claims. First, we conclude that the economic loss doctrine does not bar either count. "The law is well established that the economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation." *Allen*, 784 So. 2d at 457. *See also Moransais v. Heathman*, 744 So. 2d 973, 981 (Fla. 1999) (noting that the court had recently declined to extend the economic loss doctrine to actions based on fraudulent inducement and negligent misrepresentation). The doctrine does not apply in any event because statements made regarding Modular's slatwall sales in Florida prior to the closing date of the APA had nothing to do with performance under the APA.

We next reject Eckenrod's argument that the parol evidence rule applies to bar consideration of any statement not contained in the APA. The rule is inapplicable where a party alleges fraud or misrepresentation in the inducement to a contract. *See, e.g., Nobles v. Citizens Morg. Corp.*, 479 So. 2d 822 (Fla. 2d DCA 1985); *Tinker v. De Maria Porsche Audi, Inc.*, 459 So. 2d 487, 491 (Fla. 3d DCA 1984). Similarly, the existence of an integration clause in the APA does not foreclose such claims. *Nobles*, 479 So. 2d at 822.

Finally, we reject Eckenrod's argument that Marlite's reliance was unreasonable because he lacked the legal authority to make any representations on behalf of Precision regarding the sale of the company's assets. He asserts that publicly-available documents and the guaranty document he executed demonstrate he was neither an

officer nor director of Precision and that Marlite had constructive knowledge of this fact.

However, there is evidence in the record from which a reasonable fact-finder could determine to the contrary.  Eckenrod was designated as an officer and director in the Precision Shareholders' Agreement and, as he testified at trial in *Marlite I*, was not aware he had ever been removed from the position.  [D.E. 40-2 at 107-109; D.E. 40-5 at 203, 223].  He conceded at trial in *Marlite I* that he signed the corporate documents and thereby authorized (with the other shareholders) Precision to enter into the APA.  [D.E. 40-2 at 120-25].

Based on the foregoing, we find that a question of fact exists as to whether Eckenrod had authority to make representations on behalf of Precision in connection with the Precision transaction, and whether Marlite was justified in relying on any statements that were made.

In sum, we find that there is sufficient evidence in the record to support Marlite's fraudulent inducement and negligent representation claims.  Because disputed issues of material fact exist, judgment as a matter of law is inappropriate. Accordingly, we recommend that Eckenrod's motion for summary judgment on Counts 3 and 4 be Denied.

### 4.  *Injunctive Relief Against Modular and Eckenrod*

Marlite finally seeks summary judgment on its claims for injunctive relief against Modular (Count 5) and Eckenrod (Count 7).

In Count 5, Marlite alleged that Modular, as an "affiliate or related party" of Precision, has been violating the restrictive covenants contained in Section 5.01 of the

APA since January 31, 2006.  In view of this breach, Marlite seeks to extend the term

of the restrictive covenants pursuant to Section 5.01(b) of the APA, which provides in

relevant part:

> In the event that [Precision] or any subsidiary or affiliate of [Precision]
> should violate the aforementioned restrictive covenants, *then the time
> limitation thereof shall be extended for a period of time equal to the period
> of time during which such breach or breaches shall have occurred*; and in
> the event [Marlite] should be required to seek relief from such breach
> from any court, board of arbitration or other tribunal*, then the covenant
> shall be extended for a period of time equal to the pendency of such
> proceedings, including all appeals.*

[D.E. 1-3 at 18 (emphasis supplied)].[8]  Marlite thus seeks to prohibit Modular from

competing with Marlite's Florida business for an additional period of time equal to the

period of Modular's violation of the restrictions in the APA and continuing for the

duration of these proceedings to enforce the restrictive covenants.

In Count 7, Marlite seeks injunctive pursuant to Section 1 of the Non-Compete

in order to enforce the restrictions on competition that Eckenrod (individually and

through Modular) breached.  The relevant provision authorizes Marlite, upon a breach

or threatened breach of the Non-Compete, to seek "monetary damages and equitable

relief for a breach or threatened breach including specific performance by means of a

temporary restraining order and preliminary and permanent injunctions against"

Eckenrod, in addition to other relief.  [D.E. 1-4 at 4].

For the reasons discussed in our Report and Recommendation on Plaintiff's

Motion for Preliminary Injunction [D.E. 72 (adopted by Judge Moreno at D.E. 87)],

---

[8]     In addition, Section 5.02 provides that in the event of a violation of Section 5.01,
Marlite "shall be entitled to preliminary and permanent injunctive relief" in addition
to other relief.  [D.E. 1-3 at 18-19].

injunctive relief at this late date in the parties' business relationship is not appropriate. The harm to Marlite has already been realized, and an injunction enforcing the terms of the restrictive covenants in the APA and Non-Compete (if breached) would not change the playing field now. Moreover, any injury Marlite has suffered from Defendants' conduct can be reduced to money damages. Accordingly, we recommend that Modular's motion for summary judgment on these claims be Granted and both Counts 5 and 7 be dismissed.

### C.      *Third-Party Defendants' Motion for Summary Judgment*

#### 1.  *Indemnity Claims*

Eckenrod is seeking indemnification from Dagen and Robbins in the event he is found liable to Marlite for losses suffered as a result of misrepresentations made during negotiations over the APA or a breach of duty to disclose the fact of Modular's competition with Precision and Marlite. Specifically, Eckenrod alleges in Count 1 that Dagen and Robbins, as officers and directors of Precision, were the only individuals permitted to negotiate the sale of Precision to Marlite. Eckenrod alleges that neither he nor Modular were parties to the APA nor were they involved in its negotiation and, in fact, he was "specifically commanded to stay out of any negotiations." [D.E. 32 at 17 § 12]. He claims he did just that, and "made no representations whatsoever regarding the purchase of Precision [] to [Marlite], at any time." [*Id.*]. If any misrepresentations were made, he asserts, they "must have been by Jerry Dagen or James Robbins, in their capacities as officers and directors of" Precision []." [*Id.* at 18 § 16].

Eckenrod also alleges that Dagen and Robbins, as trustees of the assets of the successor company to Precision, had fiduciary duties over the assets of the successor

company and owed a fiduciary duty to Precision's liquidating shareholders to avoid misrepresentations or breaches of their fiduciary duties as they negotiated with Marlite for the sale of Precision.  Eckenrod denies having any duty to disclose to Marlite the fact that Modular was competing with Precision as he had no authority to speak for Precision during the negotiations.

Thus, Eckenrod contends, if Marlite is able to show it was injured as a result of misrepresentations and breaches of a duty to disclose, then it was Dagen and Robbins who breached their duties to Marlite and to him.  He concludes that Dagen and Robbins should therefore be held liable to Marlite for injuries resulting from conduct that was imputed to him under a theory of implied immunity.

In Count 2, Eckenrod's alternative claim for common law indemnity, he adopts and incorporates all the preceding allegations of the Third Party Complaint, then alleges that he

> is without fault for any alleged misrepresentation regarding competition as he not only did not make any such misrepresentation, but even if he did, such misrepresentation cannot be relied upon in the face of the facts that there is an integration clause in the [APA] preventing reliance on any oral representations, and Eckenrod had no authority to make any representations on behalf of Precision [].

[*Id.* at 19-20 ¶ 26].

Eckenrod repeats his prior allegations that Dagen and Robbins were responsible for any misrepresentations made to Marlite; that, as officers of Precision, Dagen and Robbins had a special fiduciary duty to the company and its shareholders to not make any misrepresentation that could affect the value of the company or the stockholders; that he (Eckenrod) discharged all his duties under both the Non-Compete and the APA;

and that the blame for any duty that was improperly discharged during the negotiation of the APA lies entirely with Dagen and Robbins who should be held solely responsible under common law indemnity for any loss suffered by Marlite for breach of their duty to Marlite and Eckenrod.

Third-Party Defendants moved for summary judgment on the Third Party Complaint which Eckenrod opposes.

### 2. *The June 27, 2007 General Release is a Complete Defense*

On June 27, 2007, Eckenrod signed a general release in favor of Dagen and Robbins ("General Release"). [D.E. 101 at *2*]. This General Release was entered into in connection with the settlement of *Eckenrod v. DRE Manufacturing*, No. 06-19427-CA-40 (Fla. Cir. Ct.) (hereafter "*Eckenrod v. Dagen and Robbins*"). In that case, Eckenrod sued Dagen and Robbins for claims relating to the sale of Precision to Marlite, and the rights and obligations of Eckenrod, Precision, DRE, Dagen and Robbins relating to the sale, because Eckenrod was not satisfied with the $550,000.00 he had received as part of the sales proceeds. [D.E. 101-2 at 19].

This broad General Release bars any claims that Eckenrod had or may have in the future against Dagen and Robbins from a time period stemming from the beginning of the world until the signing of the release on June 27, 2007. It is undisputed that in the Third-Party Complaint, Eckenrod is suing Dagen and Roberts for actions they took before June 27, 2007, in that the negotiations and sales at issue all took place in 2005 and 2006. Eckenrod focused on these dates in the Third-Party Complaint, and also admitted these facts at his deposition. [*Id.* at 57; D.E. 32 at 17-20 ¶¶ 10, 14, 19, 28]. Florida law states that summary judgment is warranted where, as in this case, the

plaintiff's causes of action are barred by a release signed by the plaintiff.  *See Shultz v. Florida Keys Dive Center, Inc.*, 224 F.3d 1269, 1273 (11th Cir. 2000); *AXA Equitable Life Inc. Co. v. Gelpi*, 12 So. 3d 783, 786 (Fla. 3d DCA 2009); *accord Caballero v. Gelpi*, 79 So. 3d 106, 107-08 (Fla. 3d DCA 2012).

Eckenrod contends that the June 27, 2007 General Release must be read *in pari materia* with the June 19, 2007 mediation agreement under which Eckenrod received $300,000.00 for settling *Eckenrod v. Dagen and Robbins*, the parties executed and exchanged general releases, and Eckenrod filed a Notice of Voluntary Dismissal with Prejudice of the case ("Mediation Agreement").  [*See e.g.,* D.E. 101-3 at 2-3; D.E. 101-2 at 20, 21, 39-40].  Specifically, Eckenrod argues that Paragraph 2 of the Mediation Agreement, which states that "[t]he parties will sign appropriate documentation to voluntarily dissolve [DRE]" and that Dagen and Robbins "will wind down (DRE) and will indemnify [Eckenrod] from any and all further obligations relating to DRE []" [D.E. 101-3 at 2], should be read into and incorporated into the General Release.  [D. E. 102 at 5-7].

Eckenrod's position is without merit and is borderline frivolous.  he only authority upon which Eckenrod relies, *International Ship Repairs & Marine Servs, Inc. v. General Portland, Inc.*, 469 So. 2d 817, 818 (Fla. 2d DCA 1985), is factually distinguishable from the instant case.  In *International Ship Repairs*, the appellate court found that two agreements which were executed on the same day and then each recorded on the next day, and which contained statements that contemplated the achievement of interrelated objectives, should be read and construed together.  Here, the General Release was executed eight days after the Mediation Agreement and does

not contain any statements that contemplate the achievement of the objectives stated in the earlier agreement.  Therefore,  the June 18, 2007 Mediation Agreement and Eckenrod's June 27, 2007 General Release should not be read together.

Moreover, Eckenrod executed his General Release after the parties had reached a Mediation Agreement.  Eckenrod could have placed in the General Release the clause from the Mediation Agreement that stated that Dagen and Robbins agreed that they would indemnify Eckenrod from any and all further obligations relating to DRE.  For whatever reason, Eckenrod chose to have his General Release go further that what was required by the Mediation Agreement, and he released Dagen and Robbins from the limited indemnity clause to which they had earlier agreed.  It is noteworthy that the General Release does not incorporate, reference, or rely on the Mediation Agreement, and was signed eight days later.  Thus, the General Release stands on its own as a contract without any need to interpolate or construe the Mediation Agreement, or, indeed, any other document.

In any event, even if the Mediation Agreement and Eckenrod's General Release are construed together, the Third-Party Defendants are still entitled to summary judgment.   Paragraph 2 of the Mediation Agreement specifically relates to indemnifying Eckenrod for the winding down of DRE, and does not relate to any other obligations.  Unlike Eckenrod's claim here, Paragraph 2 does not contain an agreement to indemnify Eckenrod for claims relating to Precision prior to the winding down of DRE.  The only indemnification promised in the Mediation Agreement to Eckenrod by Dagen and Robbins related to obligations incurred in winding down DRE.  It is clear that the claims brought by Eckenrod in the Third-Party Complaint do not relate to any

obligations that were incurred in the winding down of D.E after June 19, 2007, but only to claims against Dagen and Roberts for actions they took during the negotiations and sale at issue, all of which took place in 2005 and 2006.  Eckenrod's indemnification claims against Dagen and Roberts for malfeasance or misfeasance they committed during that period are forever barred under the 2007 general release.  *See, e.g., Kobatake v. E.I. DuPont De Nemours & Co.,* 162 F.3d 619, 625 (11th Cir. 1998) ("all-encompassing" general release forever barred plaintiffs for suing defendants for actions known or unknown though the date of the release no matter how egregious); *Jackson v. BellSouth Telecommunications,* 372 F.3d 1250, 1278 (11th Cir. 2004) ("The plaintiffs' instant suit seeks damages from BellSouth for conduct occurring before and during the settlement of the Adams settlement, conduct that took place before the releases were signed. If the plain terms of the releases are given effect, then, the plaintiffs' current action against BellSouth is barred."); *Mergens v. Dreyfoos,* 166 F.3d 1114, 1117 (11th Cir. 1999) ("The district court was correct in holding that the general release unambiguously bars all actions premised on claims that arose before, and contemporaneous to, the execution of the Agreement.").

Therefore, there is no factual dispute regarding how to construe the Mediation Agreement, and summary judgment should be granted in favor of Third-Party Defendants Dagen and Robbins.[9]

---

[9] In light of our recommendation that summary judgment for Third-Party Defendants is warranted based on the General Release, we will not reach the other arguments they raise in favor of summary judgment, i.e., that (1) the Third-Party Complaint is barred by the doctrine of accord and satisfaction; (2) the record contains no evidence supporting Eckenrod's claims against them; and (3) any evidence of misrepresentations by Third-Party Defendants are inadmissible due to the parol

### III.   CONCLUSION

For the foregoing reasons, this Court recommends that

1)   Plaintiff Marlite, Inc.'s Motion for Partial Summary Judgment [**D.E. 67**] be **DENIED**;

2)   Defendant/Third-Party Plaintiff Alvin Eckenrod's Motion for Partial or Final Summary Judgment [**D.E. 68**] be **GRANTED in part and DENIED in part** as follows:

    a)   Judgment should be entered in Eckenrod's favor and against Marlite on Count 1 (breach of the APA) and Count 7 of the Complaint (injunctive relief against Eckenrod); and

    b)   Eckenrod's motion in all other respects should be Denied and any "global exemption" defense barred from trial in all respects.

3)   Defendant Modular Wood Systems, Inc.'s Motion for Summary Judgment [**D.E. 69**] be **GRANTED in part and DENIED in part** as follows:

    a)   Judgment should be entered in Modular's favor and against Marlite on Count 5 of the Complaint (injunctive relief against Modular); and

    b)   Modular's motion in all other respects should be Denied.

4)   Third-Party Defendants Jerry Dagen's and James Robbins' Motion for Summary Judgment [**D.E. 101**] be **GRANTED** and the District Court enter finl summary judgment in Dagen's and Robbins' favor and against Eckenrod on all counts of the Third-Party Complaint.

------

evidence rule and the integration clause contained in the APA.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 13th day of July, 2012.

    /s/   *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate